**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **S.M. *ex rel.* D.M. & J.M., *et al.*,** | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civ. No. DLB-23-1387** |
| **MONIFA MCKNIGHT, *et al.*,** | * | |
| **Defendants.** | * | |

**MEMORANDUM OPINION**

S.M., a middle schooler who lives in Montgomery County, Maryland, is eligible for special education services under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Since S.M. became eligible for special education services, Montgomery County Public Schools ("MCPS") has developed an individualized education program ("IEP") for him annually. In this lawsuit, S.M.'s parents, J.M. and D.M., individually and on his behalf, challenge the IEP for the 2022–2023 school year, when S.M. was in fifth grade. They argue the IEP did not provide their son with a free appropriate public education ("FAPE"). For the following reasons, the Court finds that the 2022–2023 IEP provided S.M. with a FAPE.

## I.     Free Appropriate Public Education

The IDEA requires states that receive federal funding for special education services to provide children with disabilities a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A); *see G.M. ex rel. E.P. v. Barnes*, 114 F.4th 323, 329 (4th Cir. 2024); *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192 (1982). Maryland regulations also require compliance with the IDEA's FAPE requirement. *See M.G. v. McKnight*, 653 F. Supp. 3d 202, 206 (D. Md. 2023) (citing Md. Code Regs. 13A.05.01). An appropriate education provides "meaningful access to education based on [the student's] individual needs." *Johnson v. Charlotte-*

*Mecklenburg Sch. Bd. of Educ.*, 20 F.4th 835, 839 (4th Cir. 2021) (quoting *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 167 (2017)). An appropriate education may "include[] both 'special education,'" that is, "'specially designed instruction . . . to meet the unique needs of a child with a disability,'" and any "'related services,'" which "are the support services 'required to assist a child . . . to benefit from' that instruction." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (quoting 20 U.S.C. § 1401(9), (26), (29)). "This education is to be furnished in the '[l]east restrictive environment,' which means that, '[t]o the maximum extent appropriate,' a child with a disability should be 'educated with children who are not disabled.'" *G.T. v. Bd. of Educ.*, No. 21-2286, --- F.4th ----, 2024 WL 4049222, at *1 (4th Cir. Sept. 5, 2024) (quoting 20 U.S.C. § 1412(a)(5)(A)).

To provide a FAPE to a student with disabilities, a school district must develop an individualized education program, which is "the means by which special education and related services are 'tailored to the unique needs of' a particular child." *Endrew F.*, 580 U.S. at 391 (quoting *Rowley*, 458 U.S. at 181). The IDEA requires that the IEP "state the student's current educational status, annual goals for the student's education, which special educational services and other aids will be provided to the child to meet those goals, and the extent to which the child will be 'mainstreamed,' *i.e.*, spend time in regular school classroom with non-disabled students." *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014) (citing 20 U.S.C. § 1414(d)(1)(A)); *see Endrew F.*, 580 U.S. at 391. "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 399. Accordingly, the IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* Generally, this means the education

2

is "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *G.M.*, 114 F.4th at 329 (quoting *Endrew F.*, 580 U.S. at 401).

The child's parents are included in the IEP process. The parents and the school district are expected to collaborate and try to resolve any disagreements informally through a meeting or mediation before any party requests a due process administrative hearing or files suit in state or federal court. *See* 20 U.S.C. §§ 1415(e), (f)(1)(A), (f)(B)(i), (g), (i)(2)(A); Md. Code Ann., Educ. § 8-413. Due process complaints are decided by an administrative law judge ("ALJ") at the Maryland Office of Administrative Hearings. *See* 20 U.S.C. § 1415(b)(6), (f); Educ. § 8-413; Md. Code Regs. 13A.05.01.15(C)(1). While a challenge to an IEP or the child's educational placement is pending, "the IDEA[] require[s] that a student 'shall remain in [the student's] then-current educational placement' until the dispute resolution process concludes," unless the parents and the school district agree otherwise. *Davis ex rel. Davis v. District of Columbia*, 80 F.4th 321, 322–23 (D.C. Cir. 2023) (quoting 20 U.S.C. § 1415(j)); *see* Educ. § 8-413(d)(6) (equivalent provision under Maryland law). This is known as the "stay-put" provision. *Davis*, 80 F.4th at 323.

## II.    Background[1]

### A.    S.M.

S.M. has been diagnosed with language disorder; attention deficit hyperactivity disorder ("ADHD"); anxiety; motor function disorder; and impairment in reading, written expression, and mathematics. Parents' Ex. 3, at 14; ALJ Dec. 9, 18. These disabilities affect his skills in math calculation and problem solving; reading comprehension, fluency, and phonics; speech and language articulation, expressive and receptive language, and pragmatics; written language

---

[1] These facts appear in the administrative record (which includes the hearing transcript and numerous exhibits), the parties' exhibits filed in this case, and the ALJ's decision.

expression and mechanics; executive functioning, social emotional, behavioral, and physical-fine motor coordination. ALJ Dec. 9, 18. Yet S.M. excels in verbal comprehension, scoring in the 98th percentile. Hr'g Tr. 747:25 – 748:1. Because S.M. is "gifted and also has significant areas of challenge or disability" that "impact [his] ability to reach [his] cognitive potential," he has been identified as "twice exceptional." *Id.* at 748:8–9, 967:4–7. S.M. is eligible for special education services under the IDEA, and MCPS, in collaboration with his parents, develops an IEP for him annually. ALJ Dec. 8, 25; MCPS Exs. 1, 12, 43. The IEPs are intended to address S.M.'s unique needs. *See Endrew F.*, 580 U.S. at 399.

### B.   2018–2019 and 2019–2020 IEPs

For the 2018–2019 and 2019–2020 school years, MCPS developed IEPs that placed S.M. at public elementary schools for first and second grade. His parents rejected the IEPs and enrolled him at the Lab School of Washington ("Lab"), a private school for first through twelfth grade that enrolls only children with disabilities. The parents filed due process challenges to the IEPs, and an ALJ affirmed S.M.'s public-school placement for 2018–2019, his first-grade year, but ruled in favor of the parents and S.M. for 2019–2020, his second-grade year. On August 6, 2020, MCPS filed suit in this court. *Bd. of Educ. v. S.M. ex rel. D.M.*, No. LKG-20-2301 (D. Md.). During the pendency of the lawsuit, S.M. remained at Lab pursuant to the IDEA's stay-put provision.

In March 2022, toward the end of S.M.'s fourth-grade year, the court issued a decision that agreed with the ALJ: The 2018–2019 IEP provided S.M. with a FAPE, but the 2019–2020 IEP did not. *Bd. of Educ. v. S.M. ex rel. D.M.*, No. LKG-20-2301, 2022 WL 951770 (D. Md. Mar. 30, 2022). As a result, S.M.'s educational placement was Lab.

C.     **2022–2023 IEP**

In December 2020, while the parties litigated the 2018–2019 and 2019–2020 IEPs and S.M. attended Lab, licensed psychologist William Stixrud, Ph.D. conducted a neuropsychological re-evaluation of S.M. Parents' Ex. 3. Dr. Stixrud diagnosed S.M. with language disorder; ADHD – predominately inattentive presentation; specific developmental disorder of motor function; specific learning disorder with impairment in reading, written expression, and mathematics; and adjustment disorder with anxiety. *Id.* at 14. Dr. Stixrud recommended, based on S.M.'s strengths and disabilities, a "full-time special education program" with "close teacher supervision, frequent redirection of attention and multiple academic accommodations and instructional modifications to help him sustain attention and complete assigned tasks." *Id.* at 14–18. He noted that S.M. required these supports and accommodations for both academic and non-academic periods, such as lunch and recess. *Id.*

In the late spring of 2022, MCPS began the annual review process to develop S.M.'s IEP for the upcoming 2022–2023 school year, his fifth-grade year. On April 21, 2022, MCPS sent the parents a consent form to grant MCPS access to Lab's current records and information. The school district needed this information to determine S.M.'s present performance levels, which would inform the 2022–2023 IEP process. MCPS Ex. 13. On May 4, 2022, the parents provided consent. *Id.*

The parties then tried to schedule a meeting to discuss and develop an IEP. On May 12, 2022, MCPS proposed three dates for the IEP meeting: June 8, 9, and 10, 2022. MCPS Ex. 14. On May 13, the parents accepted the June 10 meeting, and then, on May 19, the parents asked to move the meeting to June 9. MCPS Ex. 15, at 3–4. On May 23, the school district accepted the revised meeting date, and then on June 1, the district asked to move the June 9 IEP meeting so that MCPS

could evaluate S.M. at Lab. *Id.* at 2. The plaintiffs suggested June 23, and the district accepted. *Id.* at 1–2. On June 7, 2022, the plaintiffs informed the district they needed to reschedule the June 23 meeting, and on June 8, 2022, the plaintiffs suggested July 20, 25, 26, 27, 28, and 29. MCPS Ex. 17, at 1–2. MCPS confirmed the meeting for July 20. *Id.*

On July 20, the IEP team—Lab staff, MCPS staff, and S.M.'s parents, attorney, and educational consultant—met to discuss a 2022–2023 IEP. MCPS Ex. 42, at 1. They did not finalize the IEP that day. MCPS determined it needed more information from Lab, which it requested, and the parties adjourned the meeting. MCPS Ex. 38, at 2.

On July 27, MCPS offered to reconvene on August 15 or 17, 2022, to complete the IEP before the start of the school year. MCPS Ex. 35, at 1. The parents asked for additional dates because their educational consultant, Richard Weinfeld, was unavailable on the proposed dates. *Id.* MCPS asked the parents whether they would agree to the extension of the 2021–2022 IEP, which had proposed placing S.M. at Barnsley Elementary School ("Barnsley"), a public school with a twice exceptional program, until the new meeting date. *Id.* On July 29, the parents responded that they would agree to extend the 2021–2022 IEP into the upcoming school year, to the new meeting date, "but would need an agreement that MCPS would continue to honor [S.M.'s] placement at Lab School during the completion of the IEP process." ECF 17-3, at 1. On August 5, and again on August 8, MCPS proposed reconvening on August 29, September 7, or September 8. MCPS Ex. 36, at 1–2. On August 8, the parents chose September 8 for the follow-up meeting and informed the district by letter:

> We hereby notify Montgomery County Public Schools that the above-referenced student . . . will attend the Lab School of Washington for the 2022-23 school year. This decision was made in order to provide him with a [FAPE] . . . . We hereby request that MCPS place and fund him at The Lab School of Washington. Should the school system refuse our clients' request for funding, they reserve the right to seek funding for that placement. We do not believe that an appropriate special

education program has been identified or offered by MCPS for the upcoming year, despite our best efforts and intentions to procure such a program or placement.

Parents' Ex. 24, at 1.

On August 31, MCPS followed up with Lab concerning the additional information the district had requested but not received. MCPS Ex. 38, at 2. Lab provided the information, and MCPS updated the draft IEP and sent it to the parents and Mr. Weinfeld in advance of the September 8 IEP meeting. MCPS Exs. 39, 40, 41.

The IEP was finalized at the September 8 meeting. After a "a full and comprehensive review of all assessment materials," including Dr. Stixrud's December 2020 neuropsychological evaluation of S.M., the IEP team developed an IEP that identified S.M.'s current levels, strengths, interests, and areas of impact. Parents' Ex. 27, at 3, 5–33. The IEP provided new goals for reading phonics, fluency, and comprehension; math problem solving; written language mechanics; written language expression with embedded written content; speech and language expression, articulation, and pragmatics; social-emotional and behavioral functioning; executive functioning; and physical and fine motor coordination. *Id.* at 55–71; MCPS Ex. 42, at 2. It included "numerous testing and instructional accommodations, use of assistive technology devices and supplementary aids and services to help [S.M.] achieve the goals on the IEP." ALJ Dec. 19; *see* Parents' Ex. 27, at 37–53. Accommodations included calculation devices, testing over multiple days, speech-to-text devices, and small group assessments, including 1:1 testing. MCPS Ex. 42, at 2; Parents' Ex. 27, at 37–53. The district and the parents agreed on these areas. MCPS Ex. 42, at 3, 4.

The school district and the parents also agreed on the IEP's special education services outside general education in a setting of seven students or fewer:

- reading instruction for 60 minutes each school day, including "explicit reading instruction, multisensory strategies, systematic approach" for reading decoding, encoding, and fluency, in a group with a student/teacher ratio of 2:1;

- English language arts education for two hours each school day;

- mathematics for 75 minutes each school day; and

- science and social sciences for 45 minutes each school day.

*Id.* at 2; Parents' Ex. 27, at 72–76; *see also* ALJ Dec. 36 (observing generally that, "throughout the [administrative] hearing, the Parents' witnesses repeatedly admitted that their input was considered [by the IEP team] and, in most instances, fully adopted").

The IEP did not name a specific program for reading instruction, but the prior written notice summarizing the results of the IEP meeting stated that "[t]he team discussed methodologies related to reading decoding/encoding/fluency and recommended a systematic approach and multisensory strategies such as those provided by Orton-Gillingham in a 2:1 ratio."[2] MCPS Ex. 42, at 4. The summary also stated that, "[f]or reading comprehension provided in the [English language arts] bloc, the team recommended specially designed instruction in a small group," with lessons targeted to S.M.'s "comprehension and writing goals with related service plugin in order to integrate comprehension with the reading of texts." *Id.*

The IEP also provided the following related services:

- individual counseling for 45 minutes twice each month;

- group counseling for 45 minutes once each week in a group with a counselor/teacher ratio of 3:1;

- speech and language services for 12 hours each month;

---

[2] Orton-Gillingham methodology is "a very explicit, systematic, cumulative diagnostic prescriptive approach to teaching reading instruction" using "multi-sensory techniques . . . that help a student learn by connecting all of those pathways to address his weaknesses with reading." Hr'g Tr. 1678:10–12, 1693:11–13; *see id.* at 1686:13–16. S.M. has received reading instruction using Orton-Gillingham methodology. The IEP itself calls for "evidence-based reading intervention" but does not "mention Orton-Gillingham because MCPS protocol is not to mention programs." *Id.* at 1379:17 – 1380:3.

- occupational therapy for one hour each week; and

- transportation services.

*Id.* at 2; Parents' Ex. 27, at 72–76. The IEP did not identify a specific program for speech and language services, but the prior written notice summarizing the results of the IEP meeting stated that S.M. would receive 12 hours per month of speech and language services, "[t]o be monitored for progress to determine if he continues to require this level of service using the REST [Rapid Syllable Transition Treatment ('ReST')] program." MCPS Ex. 42, at 2.[3] The district and the parents agreed to these services, except that the parents believed S.M. also required psychotherapy. *Id.* at 4; ALJ Dec. 37. The parents have not challenged the IEP on the ground that it did not include psychotherapy for S.M.

The IEP also provided special education services inside general education for "specials" (such as physical education, music, and art) "with support in order to practice and generalize learned social skills, calming strategies, pragmatics, and other skills." Parents' Ex. 27, at 73. According to the prior written notice summarizing the results of the IEP meeting, specials would be for 45 minutes four days per week in a "setting of 25 students or fewer with support," and lunch and recess would be in a "smaller setting with support" each school day. MCPS Ex. 42, at 2. Once again, MCPS recommended placing S.M. at Barnsley, a public school with a twice exceptional program, where MCPS insisted S.M. would receive a FAPE through the accommodations and services identified in the IEP. Parents' Ex. 27, at 76.

The parents requested that specials, lunch, and recess be provided outside of general education, and they asked for placement at Lab instead of Barnsley. MCPS Ex. 42, at 3; Parents'

---

[3] The ReST program emphasizes production of accurate sounds and syllables in multi-syllabic words. Hr'g Tr. 534:24 – 535:16. S.M. has received intervention for his apraxia (difficulty in pronouncing sounds) through the ReST program.

Ex. 27, at 34–35. They insisted that specials in a general education setting was "not appropriate as Specials still include reading and writing, areas where [S.M.] continues to be significantly impacted." *Id.* at 34. As for lunch, they noted that "MCPS proposed that [S.M.] could have lunch with 4–5 students." *Id*. As for recess, they objected to a general education setting because, even though S.M. attends recess at Lab with 90 children, MCPS's proposal for a purportedly similar recess setting did not account for the fact that S.M. attends recess at Lab with peers and staff he already knows. According to his parents, S.M. "would have a difficult transition to a new large setting, as he has had with other such transitions in the community." *Id.*

The school district rejected the parents' proposal for specials, lunch, and recess to be provided outside of general education "because the school team felt that having a structured setting to allow [S.M.] to practice his skills with general education nondisabled peers for part of his day was important to his practice of social skills and pragmatics" and would "provide enriching peer group participation opportunities for his twice-exceptional profile." MCPS Ex. 42, at 4; *see* Parents' Ex. 27, at 76. The district noted that "[t]he IEP also has numerous instructional accommodations and supplemental aids and services to provide support in these settings." MCPS Ex. 42, at 4. The district rejected the proposed placement at Lab because they did not believe S.M. "require[d] the restrictiveness of Lab" and "the school team believe[d] [S.M.'s] needs can be met in the GT/LD [Gifted and Talented/Learning Disabled] program at Barnsley, which is the least restrictive setting to meet his needs." *Id.*

On September 27, 2022, with the IEP for the 2022–2023 school year finalized, MCPS notified the parents that stay-put funding for S.M. to attend the Lab School would end. Parents' Ex. 29. On September 29, the parents filed a due process complaint for a hearing before an ALJ. Parents' Ex. 1. The parents asked the school district to place S.M. at Lab and fund the placement.

*Id.* at 7. They invoked stay-put protection. *Id.* Because the then-current educational placement was Lab (per this Court's March 2022 decision), MCPS was required to fund S.M.'s education at Lab pending resolution of the dispute over the 2022–2023 IEP. *See* 20 U.S.C. § 1415(j); *Davis*, 80 F.4th at 322–23. On October 14, 2022, S.M.'s mother toured Barnsley, and on November 3, 2022, Mr. Weinfeld toured the school. Hr'g Tr. 668:21, 671:14. They believed it would not be an appropriate placement for S.M. *Id.* at 663:1 – 666:6, 667:6 – 668:8, 672:5 – 673:22, 787:4 – 790:6, 876:23 – 877:5.

The due process hearing before an ALJ was held on January 27, February 9, 10, 13, 14, 15, 16, and 17, and March 6, 7, and 8, 2023.[4] ALJ Dec. 1–3 & nn.4–8. During 11 hearing days, the parties introduced 97 exhibits and the testimony of 12 witnesses.

Five witnesses testified on behalf of MCPS: Sarah Jackson, Jacqueline Hongladarom, Nathan Adams, Lynn Tozzi, and Sarah Mohl—experts in special education, education of twice-exceptional students, reading instruction, school psychology, occupational therapy, and speech–language pathology. *Id.* at 6–7.

Ms. Jackson and Ms. Hongladarom testified as experts in special education. Ms. Jackson's expertise is the education of gifted and talented and twice-exceptional students. *Id.* at 6. She has a bachelor's degree in special education in mild to moderate disabilities, a master's degree in teaching in secondary education, and three graduate certificates: one in gifted education including certification as a gifted specialist, one in advanced methods of differentiation and inclusion, and one in administration and supervision. Hr'g Tr. 951:14–25. Ms. Jackson is the Chairperson for the Twice Exceptional Special Interest Group for the National Association for Gifted Children, has

---

[4] Under federal regulations and state law, the due process hearing should have occurred sooner, but it took several months to find mutually agreeable dates because of the parties' conflicting schedules.

presented at several conferences, and has received the Special Populations Early Career Network Award for her work in twice-exceptional education, among other honors. *Id.* at 961:24 – 962:7, 963:19 – 964:3, 965:17 – 966:2. At MCPS, Ms. Jackson "consult[s] with different schools [and] individual teachers, and work[s] to support the needs of individual special education students," and she "also work[s] on the curriculum side where [she] help[s] develop curriculum for . . . advanced learners." *Id.* at 959:18–23. She has taught twice-exceptional students and now runs the district's GT/LD programs and trains MCPS staff. *Id.* She knows Barnsley's twice-exceptional program very well. *See id.* Ms. Jackson began observing S.M. at Lab and attending his IEP meetings in 2020. *Id.* at 975:17–23. She explained the needs of twice-exceptional students like S.M.:

> [G]ifted students, whether they are twice exceptional or gifted, need to be challenged in school, they need to have the need to have a reason to engage. When gifted students and twice exceptional students are not engaging with the curriculum, they, they're more likely to get themselves in trouble, they're more likely to not only disengage from just the academics, but disengaged from peers disengage from the school environment. They . . . become in danger of dropping out of school, they also will have social emotional responses that we see where they might become defiant, angry, aggressive, depressed, anxious . . . . [A]ll these are pieces of a profile of a student who is not engaged by putting the challenging curriculum in front of them and giving them something that is something that they're ready to tackle, and pick apart and think their way through. . . . Where it reconciles with the disability piece, again, is where . . . special educators to say, . . . how do we get them there? . . . But if [educators] don't give them the thing, in the first place that is interesting and engaging . . . , they don't have an intrinsic motivation to push themselves and to move up.

*Id.* at 1152:19 – 1153:19.

Ms. Hongladarom is an expert in special education and reading instruction. ALJ Dec. 6. She has a master's degree in special education, an advanced certification in administration and supervision, and an advanced professional certificate in special education. *Id.* at 1663:7–17. She has worked for MCPS since 1997 as a special educator, a resource teacher who "supported schools

across the county in the delivery of . . . intensive reading and math interventions across K through 12," an instructional specialist with a primary focus on reading, and an academic consultant on individual students who are not making the progress they are able to make. *Id.* at 1663:19 – 1668:13, 1674:23 – 1675:9. She reviewed S.M.'s records and attended the September 8, 2022 IEP meeting. *Id.* at 1684:14 – 1685:14. She observed the GT/LD program at Barnsley and spoke with Barnsley staff, and she visited Lab several times. *Id.* at 1684:23–25, 1701:19–24, 1705:17–23. She is familiar with Orton-Gillingham methodology and how it is implemented at both schools. *Id.* at 1678:4 – 1712:5.

MCPS's other experts addressed the services MCPS could offer S.M. Mr. Adams testified as an expert in school psychology. ALJ Dec. 6. He attended the 2022 IEP meetings, reviewed S.M.'s records, observed the GT/LD program at Barnsley, and spoke with Barnsley staff. Hr'g Tr. 1594:15–20, 1599:22 – 1600:8. Ms. Tozzi testified as an expert in occupational therapy, including clinical and school-based occupational therapy. ALJ Dec. 6. She has a master's degree in occupational therapy and more than 27 years of experience in occupational therapy. Hr'g Tr. 1897:3 – 1898:5. She assesses students, works with them, and develops and implements IEPs. *Id.* at 1899:22 – 1900:5. Half of her time she works as an instructional specialist "provid[ing] technical support to therapists in our department and support[ing] school teams in their [work with] students." *Id.* Since 2019, Ms. Tozzi has reviewed S.M.'s records, visited Lab and spoken with Lab staff several times, evaluated and observed S.M. at Lab three times, and attended IEP meetings. *Id.* at 1905:25 – 1907:14. Ms. Mohl testified as an expert in speech–language pathology. ALJ Dec. 7. She has a master's degree in speech–language pathology and more than 10 years of experience as a speech–language pathologist in clinical and educational settings. Hr'g Tr. 2024:17 – 2029:25. She attended the 2022 IEP meetings, reviewed S.M.'s records, and observed Barnsley's

GT/LD program and spoke with Barnsley staff. *Id.* at 2043:2–22. She was familiar with how the ReST program would be implemented at Barnsley. *Id.* at 2046:10 - 2050:8.

Seven expert witnesses testified on behalf of the parents and S.M.: Mr. Weinfeld, S.M.'s mother, Mary Jo Coiro, Audrey Dolginoff, Courtney Heldman, Gretchen Kunz, and Melissa Wood—experts in special education, reading instruction, child and adolescent clinical psychology, occupational therapy, and speech–language pathology. ALJ Dec. 6. S.M.'s mother and Mr. Weinfeld testified as experts in special education. *Id.* S.M.'s mother has master's degrees in special education and early childhood education, is certified as an advanced professional in special education, and works as a special education teacher. Hr'g Tr. 828:1–12, 829:21 – 830:4. Mr. Weinfeld worked for nearly 30 years as a special educator for MCPS and oversaw the Barnsley GT/LD program for several years. *Id.* at 639:13 – 640:2, 645:6–25. He had worked with S.M. since 2017, when S.M. was five years old. *Id.* During that time, Mr. Weinfeld observed S.M. several times, participated in several meetings, proposed placements, and discussed S.M. with S.M.'s parents and Lab staff. *Id.*

The other five experts were Lab directors and division heads. ALJ Dec. 6. Dr. Coiro, Director of Psychology Services, testified as an expert in child and adolescent clinical psychology. *Id.* She has a doctorate in clinical psychology, worked for 16 years as a university professor focused on teaching students to conduct assessments, and worked for five years as a clinical psychologist conducting psychosocial evaluations for children and adolescents. Hr'g Tr. 365:16–24, 370:2–6, 372:13–14. She had worked at Lab for half a year when she testified. *Id.* at 364:21–24. S.M.'s clinician introduced Dr. Coiro to S.M., and Dr. Coiro "spent some time with him in preparation for th[e] hearing." *Id.* at 384:16–22. She spoke with S.M.'s clinician and social worker about him and reviewed his records. *Id.* at 385:23–25, 386:17–18. Ms. Dolginoff, Director of

Jurisdictional Services, testified as an expert in special education. ALJ Dec. 6. Ms. Dolginoff has a master's degree in special education. Hr'g Tr. 43:18–19. For 20 years she has worked in special education, as a classroom assistant, a special educator, a special education instructional facilitator, and an IEP specialist. *Id.* at 44:10–25. In her current position, she "help[s] liaison and look at compliance with the jurisdictions of students who are placed at Lab School by the various jurisdictions," attends IEP meetings and "staffings," observes students, testifies in hearings, and "collaborate[s] with teachers . . . to discuss needs of the students and supports of the students." *Id.* at 46:3–9. She did not attend S.M.'s July 2022 IEP meeting. *Id.* at 72:25–73:1. She was the IEP specialist for S.M. and she observed him several times. *Id.* at 136:18 – 137:7. Ms. Heldman, head of the occupational therapy division, testified as an expert in occupational therapy. ALJ Dec. 6. Ms. Kunz, Director of Speech and Language, testified as an expert in speech–language pathology. *Id.* Ms. Kunz and Ms. Heldman supervised and consulted with S.M.'s clinicians and observed their sessions with S.M. They have seen S.M. at Lab regularly, but they have not worked with him directly, although Ms. Heldman has spoken with him and observed him. Hr'g Tr. 248:5–9, 252:6–20, 520:16 – 521:2. Ms. Wood, the head of the middle school, testified as an expert in speech–language pathology and reading instruction. ALJ Dec. 6. Ms. Wood has a master's degree in communication sciences and disorders and has worked as a speech–language pathologist, reading specialist, and administrator for 20 years. Hr'g Tr. 2124:22 – 2125:18. She had worked at Lab for more than ten years and, until about six months before she testified, she worked as the director of speech, language, and literacy. *Id.* at 2123:24–25, 2125:25 – 2126:13. Ms. Wood provided direct instruction on reading and spelling to S.M. every weekday for four weeks one summer during elementary school. *Id.* at 2127:9–13.

On April 26, 2023, the ALJ issued a 54-page decision finding that the 2022-2023 IEP was reasonable and afforded S.M. a FAPE. The ALJ found that the IEP "was developed in accordance with the applicable law and regulations" and noted that, once it "was finalized, the Parents agreed with all of the elements of the IEP except for services and placement." ALJ Dec. 35. The ALJ observed:

> The school-based members of the IEP team gave thoughtful consideration to the Student's strengths and weaknesses, the Parent's concerns, Dr. Stixrud's evaluation, the reports and opinion of the Lab School staff, the opinion of the Parent's educational consultant Mr. Weinfeld, and the academic, developmental and functional needs of the Student, as required by the IDEA. . . .

> Further, the IEP team . . . developed annual goals and objectives for the Student. The evidence contained in the record supports the fact that the annual goals address the Student's deficits and the IEP is reasonably calculated to meet the Student's unique individual needs as a student who is both gifted and talented and learning disabled. The goals were created to directly address the Student's areas of deficits and the IEP indicates how progress on the goals will be measured. The Student's IEP contained numerous testing and instructional accommodations, use of assistive technology devices and supplementary aids and services to help him achieve the annual goals on the IEP. The goals and objectives on the IEP were developed in accordance with the applicable law and regulations. Further, it is evident that the IEP team gave careful consideration to the recommendations made by Mr. Weinfeld, the Lab School staff, and the Parents, as throughout the hearing, the Parents' witnesses repeatedly admitted that their input was considered and, in most instances, fully adopted.

> By the end of the IEP process, the Parents did not dispute the goals and objectives that were developed in the September 8, 2022 IEP. This is crucial because the annual goals are the basis for the Student's program placement.

*Id.* at 36–37.

The ALJ also concluded that Barnsley was an appropriate placement to provide S.M. with the IEP's services and supports. *Id.* at 43. At Barnsley, S.M. could receive instruction in the least restrictive environment through "educat[ion] with other students who share his twice exceptional profile" and "inclu[sion] in the general education setting for gym, art, music, media, lunch and recess." *Id.* at 40–41. The ALJ discussed the merits of the Barnsley twice-exceptional program:

> As explained by both Mr. Weinfeld and Ms. Jackson, the GT/LD program at Barnsley is a unique program designed to build on the Student's strengths as a gifted learner and also address his needs as a learning disabled student. . . . Mr. Weinfeld explained that the GT/LD program at Barnsley is more "intensive" than other twice exceptional programming across the country [because there are] "small class program throughout the day, except the specials, lunch, recess that both addresses the gifted needs and the disability needs of the students that it serves."

> Mr. Weinfeld and Ms. Jackson *also* agree that because of the Student's gifted profile, he needs a rigorous education. As Mr. Weinfeld stated, it should be "in line with [the Student's] superior verbal comprehension abilities that are in the 98th percentile." As described by Mr. Weinfeld, the Student has a good general fund of knowledge, is inquisitive, and likes to learn new ideas. Ms. Jackson emphasized that in the GT/LD program at Barnsley, the Student would be taught by teachers with extensive training in special education and in teaching students with a twice-exceptional profile.

*Id.* at 41 (citations to record omitted).

The ALJ found that the placement of S.M. in the GT/LD program at Barnsley—where he would receive special education inside of general education for specials, lunch, and recess—was appropriate and did not deny S.M. a FAPE. *Id.* at 39–44. Even though S.M.'s parents want him to stay at Lab and they believe Lab is the best placement for him, the ALJ found that S.M. "no longer requires his program to be implemented at the Lab School which is one of the more restrictive placements on the continuum of placement options." *Id.* at 39–40.

As for the size of the general education classes, the ALJ noted that "the student to teacher ratio in the GT/LD program at Barnsley is similar to if not smaller [than at Lab] in certain instances," such as for gym. *Id.* at 41–42. At Lab, "the Student's gym class has nineteen students and is co-taught by a gym teacher and a [certified occupational therapy assistant]," compared to "a maximum class size of twenty-four students" at Barnsley, with "[a] paraeducator assist[ing] the GT/LD students while in the general education environment." *Id.*

The ALJ rejected the parents' arguments that the district had denied S.M. a FAPE based on how reading intervention would be provided at Barnsley. *Id.* at 37. The ALJ found that "that

the reading intervention as proposed in the IEP is reasonably calculated to enable the Student to receive an educational benefit." *Id.* She noted that "during the September 8, 2022 IEP meeting, the school-based IEP team members discussed methodologies related to reading, decoding, encoding, and fluency, and recommended that a systematic approach, and multisensory strategies such as those provided by [Orton-Gillingham] be implemented." *Id.*[5]

The ALJ also found that the timing of the proposed transition from Lab to Barnsley—after the school year had begun and during S.M.'s last year of elementary—did not prevent S.M. from receiving a FAPE. *Id.* at 44. She relied on Ms. Jackson's testimony that, "in proposing the placement, the MCPS considered the impact the change would have on the Student." *Id.* at 43. The ALJ stated:

> Ms. Jackson explained that it is not uncommon to have students move into the GT/LD program during the course of a school year. Ms. Jackson stated that once a parent accepts the program, a transition plan designed to support the student's unique needs is developed. Ms. Jackson stated that to prevent students from becoming overly anxious regarding a possible change, the general practice is not to tour students at a proposed new placement until after the IEP is finalized. Ms. Jackson emphasized that the student's and parent's comfort level determines how slow or fast the transition occurs.

*Id.* (citations to record omitted). The ALJ "did not detect any bias" in Ms. Jackson's testimony, and she found it to be "clear, direct, [and] focused on the strengths and weaknesses of the Student." *Id.* at 40. The ALJ also found Ms. Jackson "exhibited a true desire to meet the Student's unique needs as a twice-exceptional student." *Id.*

The ALJ discounted Mr. Weinfeld's opinion that "mov[ing] [S.M.] in his last year of elementary school when he's progressing in his current environment would cause the Student to

---

[5] The ALJ did not address the parents' concern that S.M. would be placed with a younger student for reading intervention using Orton-Gillingham methodology. She also did not address the provision of the ReST program at Barnsley—which the plaintiffs challenge in this case—because the parents did not raise the issue at the administrative hearing.

regress" and generally gave more weight to the testimony of MCPS's experts. *Id.* The MCPS experts were familiar with the twice-exceptional program at Barnsley. The ALJ found that most of the parents' experts, in contrast, "had no real experience with [S.M.] and lacked sufficient knowledge to opine on the adequacy of the GT/LD program at Barnsley." *Id.* at 42. One exception was Mr. Weinfeld, but the ALJ placed little weight on his testimony because he seemed out of touch with S.M.'s current strengths and needs. As the ALJ found, "other than his June 7, 2022 observation that was conducted in preparation for participating in the Student's IEP meeting, Mr. Weinfeld could not remember the last time he observed the Student." *Id.* at 40.[6] The ALJ also discredited Ms. Dolginoff's testimony that "the student had trouble transitioning to the middle school program at Lab for the 2022-2023 school year" because she supported her statement with only one example: "the Student would cry in gym class if he wasn't paired with his friend." *Id.* at 42. Further, the ALJ relied on "objective evidence contained in the record"—a writing sample from S.M. that "shows a student who was excited to experience *new* things." *Id.* In the writing sample, S.M. stated that, for fifth grade (the first year of middle school at Lab), he was "excited for choosing classes," "to be on a sports team," and "to be on the upper campus." Parents' Ex. 12 (quoted in ALJ Dec. 42). And the ALJ noted S.M.'s success "participat[ing] in school assemblies where 'he's able to raise his hand and comment or ask questions'" with approximately 180 students present. ALJ Dec. 42. "Even after considering the Student's mother's testimony and the Parents' experts," the ALJ was "persuaded that . . . Ms. Jackson and the faculty and staff at Barnsley are equipped to assist the Student with a successful transition to the GT/LD program." *Id.* at 40.

---

[6] Ms. Wood had the most one-on-one instructional experience with S.M., having taught him reading and spelling for four weeks one summer when he was in elementary school, but she did not testify about whether transfer to Barnsley after the school year began would deny S.M. a FAPE. In fact, Ms. Wood did not opine at all on whether the IEP, placement at Barnsley, or Barnsley's twice-exceptional program were appropriate for S.M.

The ALJ concluded that the alleged procedural violation—MCPS's failure to finalize an IEP before the start of the 2022–2023 school year—did not deny S.M. a FAPE because S.M. received uninterrupted, "consistent educational services at the Lab School at the expense of the MCPS until the IEP was finalized." *Id.* at 34. The ALJ found no merit to the parents' argument that the timing deprived them of the opportunity "to observe the proposed placement" at Barnsley and then "make a fully informed decision about placement." *Id.* The ALJ reasoned that, not only did the parents "elect[] to wait to observe the program at a later date," but also, "prior to the start of the 2022-2023 school year, the Parents made it clear that they intended to continue the Student's enrollment at the Lab School and reject any alternative placement proposed by the MCPS." *Id.* at 34–35. The ALJ concluded that even if the parents had observed Barnsley and the IEP had been finalized before the school year, neither event would have changed the parents' mind that Lab was the only appropriate educational placement for S.M. *Id.*

On May 23, 2023, S.M. and his parents filed this lawsuit and "invoke[d] their right to stay-put protection under the IDEA . . . ." ECF 1, ¶ 92. They claim that MCPS failed to provide S.M. "an appropriate educational placement" and a FAPE. *Id.* ¶¶ 94 & 96. They claim the ALJ erred by not basing her decision on "an accurate and impartial understanding of the facts" and by applying the wrong legal standards. *Id.* ¶¶ 98 & 99. They ask the Court to vacate the ALJ's decision and order MCPS "to reimburse plaintiffs for any tuition expenses and costs incurred in S.M.'s enrollment at Lab for the 2022-2023 school year." *Id.* at 14. They also ask the Court to enter judgment in their favor and to "[i]ssue declaratory relief that [MCPS] violated plaintiffs' rights under applicable law." *Id.* Finally, they ask the Court to order MCPS to "place and fund S.M. at Lab and declare it to be his current educational placement under IDEA." *Id.*

The parties briefed cross-motions for summary judgment, ECF 13, 13-1, 17, 17-1, 21, 28, and MCPS filed two exhibits, ECF 17-3, 17-4. The parties also filed under seal a paper copy of the lengthy administrative record. Additionally, the plaintiffs moved to submit additional evidence. ECF 22. MCPS opposed the motion, ECF 29, and the plaintiffs filed a reply, ECF 32.

The Court finds that the ALJ's findings of fact and credibility determinations were regularly made and gives them due weight. Having reviewed the entire record *de novo*, the Court concludes that the IEP and S.M.'s placement at Barnsley were appropriate and reasonably calculated to provide S.M. with a FAPE. Accordingly, MCPS is entitled to summary judgment on the plaintiffs' claims. MCPS's motion for summary judgment is granted, and the plaintiffs' motion for summary judgment is denied.[7]

### III.    Standard of Review

The plaintiffs' challenge to the IEP and S.M.'s placement at Barnsley is an independent civil action, not an appeal of the ALJ decision. "As a lower federal court, the district court cannot affirm, reverse, vacate, or remand the state hearing officer's decision." *G.M.*, 114 F.4th at 330; *see Johnson*, 20 F.4th at 845.

To resolve IDEA claims, the district court "(1) receive[s] the record of the administrative proceeding, (2) hear[s] additional evidence at the request of a party, and (3) base[s] its decision on the preponderance of the evidence," considering both the ALJ's findings of fact and the additional evidence. *G.M.*, 114 F.4th at 333–34 nn.2 & 3 (quoting *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 516–17 (4th Cir. 2014)); *see* 20 U.S.C. § 1415(i)(2)(C). The

---

[7] Recently, the parties began to develop a 2024–2025 IEP that provides for S.M.'s placement in a middle school twice-exceptional program. ECF 36, at 11. On August 5, 2024, the parents notified MCPS that S.M. will remain at Lab for the 2024–2025 school year. *Id.* On August 15, 2024, the parents filed a due process complaint challenging the not-yet-finalized 2024–2025 IEP. *Id.*; ECF 35, at 2 & n.1.

district court conducts "a modified de novo review" of the administrative record, "affording 'due weight' to the state administrative proceedings." *G.M.*, 114 F.4th at 333–34 (quoting *M.M. ex rel. D.M. v. Sch. Dist*, 303 F.3d 523, 530–31 (4th Cir. 2002)).[8]

The court "treat[s] the state hearing officer's factual findings and credibility determinations as '*prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding,' so long as the findings were 'regularly made.'" *Id.* at 334 (quoting *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991)). Whether findings were "regularly made" depends on "the '*process* through which the findings were made,' not the results of that process." *Id.* (quoting *Bouabid v. Charlotte-Mecklenburg Sch. Bd. of Educ.*, 62 F.4th 851, 857 (4th Cir. 2023)). Findings are "regularly made" if the ALJ "conducted a proper hearing," that is, the ALJ "allow[ed] the parents and the School Board to present evidence and make arguments," and the ALJ "by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *Id.* (quoting *J.P. ex rel. Peterson v. Cnty. Sch. Bd.*, 516 F.3d 254, 259 (4th Cir. 2008)). Thus, if the ALJ "employs a process that is not 'far from the accepted norm of a fact-finding process,'" the court "can rely on her findings when making [an] independent decision based on a 'preponderance of the evidence.'" *Id.* (quoting *J.P.*, 516 F.3d at 259, and then 20 U.S.C. § 1415(i)(2)(C)(iii)). The court need not rely on the ALJ's findings of fact, but if it does not, it "must 'explain why'" it rejects those findings. *Id.* (quoting *Doyle*, 953 F.2d at 105).

---

[8] The parties to this suit, like most parties to an IDEA action, filed cross-motions for summary judgment. As the Fourth Circuit recently explained, "this is a procedural misnomer." *G.M.*, 114 F.4th at 333 n.2 (quoting *E.L.*, 773 F.3d at 516–17). Nonetheless, through their summary judgment briefing and their submission of the administrative record, the parties have provided the information the Court needs to conduct a modified *de novo* review of the ALJ's decision in accordance with Fourth Circuit and Supreme Court law.

The court cannot "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." *Rowley*, 458 U.S. at 206. Rather, the court must "remain mindful that the 'IDEA requires great deference to the views of the school system rather than [to] those of even the most well-meaning parent.'" *G.M.*, 114 F.4th at 334 (alteration in original) (quoting *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 328 (4th Cir. 2004)). Similarly, the court "afford[s] great deference to the judgment of education professionals." *E.L.*, 773 F.3d at 517.

When a party challenges an IEP at the administrative level or in federal court, the burden of proof falls on the party seeking relief. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005). Here, the plaintiffs bear the burden of proof.

## IV.    Discussion

The plaintiffs claim that the ALJ erred on four grounds when she concluded that S.M. would receive a FAPE at Barnsley. First, they claim that the ALJ's factual findings were not regularly made and that the ALJ gave "complete deference to the MCPS witnesses" and gave "little weight to" or "completely ignored" their witnesses. ECF 13-1, at 15, 36, 38. Second, they claim the ALJ erred in finding that S.M. would receive a FAPE at Barnsley even though S.M. would have been required to transfer there from Lab a few weeks after the school year started. *Id.* at 20–27. Third, the plaintiffs claim the ALJ erred in concluding that S.M. could receive a FAPE in an educational program that, like Barnsley's, included larger, mainstream classes for specials (music, art, and physical education), lunch, and recess. *Id.* at 28. Fourth, they claim the ALJ erred in failing to address how the ReST program for speech and the Orton-Gillingham methodology for reading would be implemented at Barnsley. *Id*. at 32–33.

The plaintiffs also assert a procedural violation. They claim that MCPS hindered their ability to participate in the IEP process and consider a new placement for S.M. before the start of

the school year because the IEP was not finalized until September 8, 2022, a few weeks after the

school year began. They also claim the timing impeded S.M.'s right to a FAPE because the parents

had "to file a due process appeal and proceed through the hearing, all at their own cost." *Id.* at 18&

19 n.3.[9]

### A.  The ALJ's Findings of Fact and Credibility Determinations

The ALJ's findings of facts were regularly made. The ALJ "conducted a proper hearing."

*See G.M.*, 114 F.4th at 336. The hearing spanned 11 days. Both sides presented several witnesses,

and together, they introduced 97 exhibits. ALJ Dec. 1–3. The ALJ heard testimony from five

MCPS expert witnesses: two special education experts, a school psychologist, an occupational

therapist, and a speech–language pathologist. *Id.* at 6–7. The ALJ also heard testimony from seven

expert witnesses for the plaintiffs: three special education experts (including S.M.'s mother), a

child and adolescent clinical psychologist, an occupational therapist, and two speech–language

pathologists. *Id.* at 6. Additionally, the ALJ heard argument from counsel for both parties. The

ALJ then issued a 54-page decision with findings of fact and conclusions of law. "This process

was well within the accepted norm of a fact-finding process, so the ALJ's findings are *prima facie*

correct and can be relied upon when conducting [the Court's] own independent review." *See G.M.*,

114 F.4th at 334–35.

---

[9] The plaintiffs also claim that their due process complaint was moot when the ALJ issued her decision in March 2023 and that this case is moot now. ECF 13-1, at 33–36; ECF 35. The parties' initial briefing on mootness raised more questions than answers. So, the Court held an on-the-record call on August 6, 2024 to discuss the plaintiffs' mootness argument, ordered supplemental briefing on the issue, and held an in-person hearing on September 6, 2024. For the reasons stated on the record, this case is not moot, and the due process complaint before the ALJ was not moot. As both parties agree, a ruling on the plaintiffs' claims in this case will determine S.M.'s current educational placement and will affect whether MCPS must continue to fund S.M.'s placement at Lab, which the school district has funded pursuant to stay put since the start of the 2020–2021 school year. Because this case is not moot, the Court denies the plaintiffs' motion to admit additional evidence, which concerned only their mootness argument.

The plaintiffs do not challenge the regularity of the ALJ's fact-finding process. Instead, they contend the ALJ deferred completely to the MCPS witnesses and gave little weight to or ignored their witnesses entirely. ECF 13-1, at 36, 38. The record does not bear this out. The ALJ stated that her "findings, analysis, and legal conclusions [we]re based on consideration of all of the parties' arguments and the credible evidence in the record," and that "[a]ll admissible testimonial and documentary evidence was considered and given the weight it was due, regardless of whether it has been recited, cited, referenced, or expressly set forth in the Decision." ALJ Dec. 7 n.14. That statement alone is sufficient to find that the ALJ did not ignore the plaintiffs' witnesses' testimony. *See G.M.*, 114 F.4th at 335 ("Even if the written decision had not referenced [a particular witness's] testimony, [the court] would not infer that the ALJ failed to consider it" because "[h]earing officers are not required to address every data point in the record for their findings to be regularly made.").

The ALJ did much more than merely state she considered all the testimony. She explained in detail her assessment of the testimony, including the testimony of the plaintiffs' witnesses Dr. Coiro, Mr. Weinfeld, and S.M.'s mother. *See* ALJ Dec. 38–43.

The ALJ found that "Dr. Coiro's experience with [S.M.] was minimal as she testified that she had seen him in the hallways as he traveled to [Lab psychologist] Dr. Erat's office," and Dr. Coiro "had minimal conversation with Dr. Erat about the Student's specific goals, had not conducted any observations of the Student, and had not spoken with any of his teachers." *Id.* at 38. The ALJ stated that, "in light of the evidence contained in the record, [she gave] little weight to Dr. Coiro's opinion regarding placement." *Id.* at 39.

As for Mr. Weinfeld, the ALJ noted that he "is highly recognized and very successful as a special education consultant," "has consulted with the Student's family for several years," and

"has reviewed reports, evaluations, attended IEP meetings and conducted observations of the Student." *Id.* at 40. Even so, the ALJ gave little weight to Mr. Weinfeld's opinion that moving S.M. in his last year of elementary school would cause him to regress, because "other than his June 7, 2022 observation that was conducted in preparation for participating in the Student's IEP meeting, Mr. Weinfeld could not remember the last time he observed the Student." *Id.* at 40.[10] The ALJ also observed that Mr. Weinfeld agreed with Ms. Jackson, the MCPS expert in special education, about the excellence of the GT/LD program at Barnsley and S.M.'s need for "a rigorous education," which Ms. Jackson explained Barnsley's twice-exceptional program could provide. *Id.* at 41.

The ALJ then addressed the testimony of S.M.'s mother. The ALJ acknowledged that "[w]ithout question, the Student's mother is knowledgeable about all aspects of the Student['s] education including his strengths and challenges as a student with multiple disabilities." *Id.* at 39. The ALJ noted that Mr. Weinfeld and S.M.'s mother "opined that the Student's needs would best be met in a small classroom setting at a fulltime self-contained program, in this instance at the Lab School." *Id.* The ALJ found that, notwithstanding the mother's testimony, "the objective evidence contained in the record establishes that the Student no longer requires his program to be implemented at the Lab School which is one of the more restrictive placements on the continuum of placement options." *Id.* at 40. The ALJ stated that, "[e]ven after considering [S.M.'s] mother's

---

[10] The plaintiffs argue that "[t]his statement completely mischaracterizes Mr. Weinfeld's testimony," because Mr. Weinfeld also stated that he "do[es] observe S.M. periodically" and "ha[s] observed him many times." ECF 13-1, at 35. It is true that Mr. Weinfeld testified that he observed S.M. several times, but Mr. Weinfeld also testified that he did not recall whether he observed S.M. before a May 17, 2022 Lab IEP meeting or at all during the 2021–2022 school year before the June 7, 2022 observation. Hr'g Tr. 682:12–22, 683:1–3. Mr. Weinfeld later testified that he did *not* observe the student in preparation for the May 17, 2022 meeting, and while he remembered observing S.M. during the 2019–2020 school year, he was not sure he had observed S.M. since the pandemic began in March 2020. *Id.* at 687:10–12, 15–19, 690:8–10.

testimony and the Parents' experts, [she was] persuaded that the MCPS prepared an appropriate IEP for the 2022-2023 school year and that Ms. Jackson and the faculty and staff at Barnsley are equipped to assist [S.M.] with a successful transition to the GT/LD program." *Id.*

The ALJ was "not required to provide an explanation for 'accepting the testimony of one witness over that of another.'" *G.M.*, 114 F.4th at 335 (quoting *Cnty. Sch. Bd. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 306–07 (4th Cir. 2005)). Even so, the ALJ here did explain her reasons for rejecting the opinions of the parents' witnesses and crediting the opinions of MCPS's witnesses.

As to the parent's witnesses, the ALJ stated: "[T]he Lab School has determined that department heads will attend and testify as experts in due process hearings," and "[a]s such, after giving their opinions on direct examination, it was quickly revealed that in most instances, the witness had no real experience with the Student and lacked sufficient knowledge to opine on the adequacy of the GT/LD program at Barnsley." ALJ Dec. 42. In another instance, the ALJ noted that, contrary to the opinion of S.M.'s mother, the objective evidence established that S.M. no longer required the restrictive learning environment at Lab, which is "one of the more restrictive placements on the continuum of placement options." *Id.* at 39–40. And the ALJ explained why she rejected Ms. Dolginoff's testimony that "the student had trouble transitioning to the middle school program at Lab for the 2022-2023 school year": The only support the witness gave for her assertion was that "the Student would cry in gym class if he wasn't paired with his friend," and "the objective evidence contained in the record shows something different"—"a student who was excited to experience new things." *Id.* at 42. The ALJ noted that S.M., in a writing assignment at the end of fourth grade (the end of lower school at Lab), wrote that he was "excited for choosing classes," "excited to be on a sports team," and "excited to be on the upper campus"—all changes for the coming year. *Id.* (quoting Parents' Ex. 12).

By contrast, the MCPS witnesses knew the GT/LD program at Barnsley well, had visited Lab and observed S.M. at Lab several times, and had participated in S.M.'s IEP meetings over the years. Hr'g Tr. 959:18–23, 975:17–23, 1594:15–20, 1599:22 – 1600:8, 1684:14 – 1685:14, 1705:17–23, 1905:25 – 1907:14, 2043:3–22. The ALJ found Ms. Jackson particularly knowledgeable and credible. The ALJ noted there was no detectable bias in Ms. Jackson's testimony, which was "clear, direct, [and] focused on the strengths and weaknesses of the Student," whose needs Ms. Jackson "exhibited a true desire to meet." ALJ Dec. 40.[11]

Essentially, the plaintiffs are arguing that the "ALJ's factual findings and credibility determinations are inconsistent with the evidence and thus, not regularly made." *See G.M.*, 114 F.4th at 334 (citation to brief omitted). As the Fourth Circuit observed in *G.M.*, "[t]his argument is virtually always bound to fail because it imports a merits conclusion into what is supposed to be a procedural inquiry," as the court "cannot know what is inconsistent with the evidence until [the court] consider[s] the merits and figure[s] out whose interpretation of the evidence is correct." *Id.*

In sum, the ALJ's findings of facts and credibility determinations were regularly made. The ALJ did not ignore the plaintiffs' experts or arbitrarily believed the MCPS experts when she determined whose testimony to give the most weight. The ALJ's process was well within the accepted norms of a fact-finding process. The Court treats the ALJ's findings of fact and credibility determinations as *prima facie* correct and relies on them when making an independent decision on the merits.

---

[11] The plaintiffs do not challenge the ALJ's assessment of witness credibility. Nor could they. The ALJ was not "required to use any particular metric when assessing credibility." *G.M.*, 114 F.4th at 335. She could "assess credibility based simply upon an intuitive impression of candor." *Id.* (quoting *Bouabid*, 62 F.4th at 859).

**B.  Timing of Change in Placement**

The plaintiffs claim that S.M. could not have received a FAPE at Barnsley because MCPS did not finalize the IEP until September 8, 2022, two weeks into the school year, and S.M.'s anxiety would have made it very difficult for him to transition successfully to a new school after the school year had started.[12] The Court finds that the timing of S.M.'s transition from Lab to Barnsley, a few weeks into the school year, would not have prevented S.M. from receiving a FAPE at Barnsley.[13]

Ms. Jackson, the head of MCPS's GT/LD programs, explained how the staff at Barnsley would mitigate the difficulties that S.M. might experience during his transition from Lab to Barnsley. Hr'g Tr. 1192, 1193, 1195–99. Ms. Jackson noted that mid-year transitions to Barnsley's twice-exceptional program are not uncommon, and she discussed the steps staff take to support students as they transition from another school to Barnsley. *Id.* at 1195:15–20. After the IEP is finalized, the student is given a tour of the building, perhaps after school hours and/or with "a teacher or trusted adult from their current setting." *Id.* at 1196:13–25. The student meets the general

---

[12] The parents blame MCPS for not finalizing the 2022–2023 IEP before the school year began. If blame is to be cast, the parents bear their fair share. The record reveals that the delay in finalizing the IEP was reasonable and not solely caused by MCPS. As Ms. Jackson credibly explained, MCPS did not begin planning for the 2022–2023 IEP meeting until late Spring 2022 because the previous IEP, which was developed in June 2021, did not expire until June 2022, and the district "want[ed] to get information as close to that end date as we could in order to establish the most present levels [of performance] at the time." Hr'g Tr. 1441:5 – 1442:4. MCPS asked to reschedule the initial meeting, set for June 9, so the school district could observe S.M. at Lab. The next meeting was supposed to occur on June 23—a date the parents had proposed—but the parents asked to reschedule that meeting for July 20, nearly a month later. MCPS Ex. 15, at 1–2; MCPS Ex. 17, at 1–2. And, when MCPS proposed August 15 or 17 for a second meeting, the parents requested additional dates, which pushed the second and final meeting back to September 8. MCPS Ex. 35, at 1; MCPS Ex. 36, at 1–2; Parents' Ex. 24, at 1. The school district did not unreasonably or unilaterally delay the finalization of the IEP.

[13] The plaintiffs do not argue that the IEP was deficient because it did not include a mid-year transition plan. And even if they did, the argument would be unpersuasive. As Ms. Jackson explained, "the transition process" does not begin "until after the IEP is finalized, because [MCPS does not] want [their] students to become anxious over a possible change." Hr'g Tr. 1196:6–11.

education specialist, the school counselor, and the school psychologist, among others. *Id.* at
1197:2–5. According to Ms. Jackson, the student's initial period in the school "is very student
dependent," and the school allows the student to "take the lead on how much [the teachers] expose
them out in general education" and "to pick the subject area they like." *Id.* at 1198:3–9. The school
also "help[s] them foster friendships." *Id.* at 1199:6. Ms. Jackson testified that "anytime a student
comes into [an MCPS] program, especially when students are coming from more self contained
settings than we are, . . . when we are . . . helping a student acclimate to our environment, we keep
them in our environment as much as we can," while implementing the transition gradually. *Id.* at
1192:23 – 1193:5. She elaborated:

> [T]hat might look like having lunch with peers in the classroom. That might look
> like going down and observing the larger setting with a par[a]educator and then
> working on the actual assignment in another location. It could be one on one with
> the student. It could be pulling several students from our program so that the student
> would spend more time during the day with those peers until they are comfortable
> with them and then gradually moving them into the larger setting over the course
> of time and that would be by the student's level of comfort as we make those
> changes.

*Id.* at 1193:5–15.

    Ms. Jackson explained that, during S.M.'s transition to Barnsley, the staff would provide
the supports identified in his IEP "to meet [S.M.'s] needs as he's transitioning into the program."
*Id.* at 1195:15–20, 1202:22 – 1203:12. For example, they would provide "instructional and
assessment accommodations," "small group" settings, "separate[e] or alternate location[s],"
"assistance with organization," "visual supports," and "sentence starters" to facilitate the transition
to Barnsley. *Id.* at 1202:23 – 1208:2. The staff would have the supports ready at the start of the
transition process, "whether it's helping him feel comfortable with headphones or noise buffers"
or "assigning him a friend, buddy within the class to go with him when he's navigating the building
more independently." *Id.* at 1203:12–21. Initially, they would provide smaller group settings and

different lunch and recess settings "until he is able to comfortably integrate with a larger class setting." *Id*. at 1203:23 – 1204:11. S.M. would be able to take breaks and check in with support staff such as the school psychologist. *Id*. at 1204:12–18. Staff would "monitor[] how he's feeling" to see if adjustments need to be made in his day. *Id*. at 1207:16 – 1208:3. And they would help him process his feelings and problem solve by "talking through how he feels, [asking] what is the problem?" *Id.* at 1211:12–16. Ms. Jackson explained:

> It's not unusual for a student to say, you know, what's the problem? How are you feeling? You know, I hate it here. That sounds like a pretty big problem. And then kind of breaking down, what is it that's making him say that, and then helping him think through, you know, chunking it down, breaking it down to different pieces of a problem, and then modeling for him and talking him through the problem-solving process, identify the problem, identify possible solutions, think through consequences of solutions, and identify a solution. I'm not going to throw that all at him on the first day, but that's the process eventually we would like him to get through.

*Id.*

The plaintiffs' witnesses opined that S.M.'s anxiety would make it very difficult to change schools after the school year began and complained that there was no transition plan in place to show how he would be supported in the transition. *E.g.*, *id.* at 147:11–20, 148:17–25, 663:9 – 664:21, 816:15–25, 863:20 – 864:1, 929:19–23. Ms. Dolginoff noted that when S.M. transitioned to the Lab middle school, which began in fifth grade, it took him about a month and half to adjust and he would cry if he was not on the same team as his friend. *Id.* at 138:21 – 139:7. But she did not provide any other examples of how his anxiety affected his transition or discuss the supports that Lab provided to assist him in the transition to the Lab middle school. Moreover, Ms. Dolginoff testified that S.M. "has demonstrated increased success" in transitioning or having his schedule changed, so that now he "participat[es] in whatever the transition or change in schedule is, rather than asking a number of questions, or appearing emotionally flooded." *Id*. at 139:8–11. She did not have any deeper familiarity with S.M. than Ms. Jackson—both based their opinions on

observations, records review, and IEP discussions. Ms. Jackson, however, specified how Barnsley staff would support S.M. during the transition. None of the plaintiffs' witnesses addressed the adequacy of the supports Barnsley could offer S.M. during the transition from Lab to Barnsley.

Dr. Coiro testified that, due to S.M.'s anxiety, he "would have a hard time adjusting socially," would be distracted, and would be "less available for accessing the curriculum" if he transitioned after the school year started. *Id.* at 413:8–23, 419:7–13. When asked whether she had concerns about a mid-year transition, Ms. Kunz testified about her concerns with implementation of the ReST program for speech. *Id.* at 547:7–12. Specifically, she noted that a clinician at Lab already had begun to implement the ReST program with S.M., knows the program, and knows how much progress S.M. has made in the program. *Id.* In response to the same question, Ms. Kunz also said she had "concerns about the impact of his communication on overall emotional well-being in a larger classroom where he has to find of fend for himself a little more conversationally and in classroom discussions." *Id.* at 547:12–21. These concerns are valid, but the staff at Barnsley was well equipped to address them. Barnsley staff were experienced with helping anxious students like S.M. transition from a school with a self-contained environment like Lab to Barnsley. Further, none of these witnesses testified that S.M. would not be able to make appropriate progress due to his anxiety caused by transitions.

Mr. Weinfeld testified that a transition to Barnsley for S.M.'s last year of elementary school, particularly after the school year started, would heighten S.M.'s anxiety, impact his educational performance, and cause him to regress. *Id.* at 663:9 – 666:6. For those reasons, Mr. Weinfeld opined that S.M. should not have been placed at Barnsley at all for fifth grade. Yet Mr. Weinfeld also said if S.M. was going to Barnsley for fifth grade, MCPS should have begun the IEP process earlier in the Spring so that S.M. and his parents would have had time to prepare for

the transition to Barnsley. *Id.* Mr. Weinfield did not identify any additional difficulties that S.M. might have experienced if he had transitioned to Barnsley mid-year. *See id.*

S.M.'s IEP and his placement at Barnsley were "reasonably calculated to enable [him] to make progress appropriate in light of [his] circumstances." *See Endrew F.*, 580 U.S. at 399. Even if transferring a few weeks into the school year was not ideal, Barnsley staff were prepared to support S.M. and help him manage his anxiety during the transition. The IEP and placement at Barnsley were reasonable and appropriate. S.M. was not denied a FAPE because he would have had to transition to Barnsley mid-year.[14]

### C. Inclusion in Mainstream Classes

The plaintiffs agree that the class sizes at Barnsley for S.M.'s academic classes outside of general education were appropriate. MCPS Ex. 42, at 3, 4. Those classes—reading instruction, English language arts, mathematics, science, and social studies—would be taught in a setting of seven students or fewer. *Id.* at 2. But S.M. would be in larger, mainstream classes at Barnsley for specials, like music, art, and physical education, with as many as 20–25 students, and for lunch and recess, with as many as 170 students. The plaintiffs claim S.M. could not receive a FAPE in these larger, mainstream classes, even with a paraeducator present and the assistance of the IEP's supports, because even in smaller classes, S.M. experiences anxiety, inattention, and difficulty

---

[14] The parents also argue the timing of a transfer to Barnsley would have denied S.M. a FAPE in another way: Because S.M. would have attended Barnsley, an elementary school, only for one year and then would have switched schools again for sixth grade, it would have been better for S.M. to remain at Lab for fifth grade. The Court finds that the change in placement to Barnsley was reasonably calculated for S.M. to make appropriate progress even though he would be at Barnsley for only one grade. The district placed S.M. at Barnsley because it was the least restrictive environment that could provide the services and supports he needed to meet the IEP's goals and objectives. Barnsley was equipped to support S.M. through the transition from Lab. Even though S.M. would be at Barnsley for only one year, Barnsley was an appropriate and reasonable placement for the 2022–2023 school year. Additionally, MCPS had placed S.M. at Barnsley for fourth grade, but the parents chose to keep him at Lab.

with peers. Placing S.M. in larger classes for specials, recess, and lunch would be even more difficult for him and would not provide him with a FAPE.

The Court finds that providing S.M. special education inside general education classes for specials, lunch, and recess was reasonably calculated for him to make progress in the least restrictive environment. At Barnsley, S.M. would receive special education instruction, outside of general education, in English language arts, math, science, and social studies with other twice-exceptional students. ALJ Dec. 40–41. He would receive special education instruction, inside of general education, for specials with nondisabled peers, and he would be with nondisabled peers during lunch and recess. *Id.* The specials would have no more than 25 students, with a teacher and a paraeducator in each class. *Id.* at 42; MCPS Ex. 42, at 2. Ms. Jackson noted that, while "the IEP . . . said a maximum number of 25 students, . . . the actual number of students in [Barnsley] classes is smaller. And [they] have the ability to craft them smaller if it were necessary for S.M." Hr'g Tr. 1216:19–22. At Lab, where the parents believe S.M. should be placed, "not all classes . . . are small," ALJ Dec. 41–42; S.M.'s gym class at Lab had 19 students.

As for lunch and recess, Ms. Jackson testified that she did not "think [they] would ever make a student go sit in the larger cafeteria." Hr'g Tr. 1199:9–10. Rather, they start with "lunch bunches" and "[e]ventually . . . move down to the smaller room across from the cafeteria." *Id.* at 1199:7–8. She explained that it is a "sensory space" that is "available for all students" as a "quiet spot," although students in special education "have priority." *Id.* at 1199:11–17. She noted that that in the twice-exceptional program, the "optional alternative seating" is available for "quiet lunch and recess." *Id.* at 988:22–24. In comparison, at Lab, all 43 fifth grade students ate lunch together. *Id.* at 60:24 – 61:1.

The plaintiffs rely on the testimony of Ms. Dolginoff, Lab's special education expert. ECF 13-1, at 28–29. Ms. Dolginoff testified that S.M. exhibits anxiety and has trouble staying on topic, which she said could be attributed to anxiety or ADHD. Hr'g Tr. 138:20 – 139:7, 140:13–22. She said he "needs . . . prompts and reminders" and he requests "a lot of verbal, feedback or check ins with teachers, even when it is a task that . . . he has demonstrated that he can do independently." *Id.* at 141:1–5. She opined that S.M. "needs a full-time special education program" with small classes and "especially [a low] student/teacher ratio" to "have the supports in place to ask and get his needs met to encourage and foster independence, and to continue to make progress socially and academically, and to access his full curriculum." *Id.* at 142:20 – 143:10.[15] The needs that Ms. Dolginoff identified (feedback, prompts, and check-ins) can be provided by a teacher and paraeducator inside of general education. The plaintiffs have not shown that, with both professionals present, S.M. would not receive the prompts, reminders, and feedback that he needs during specials.

The plaintiffs also rely on Mr. Weinfeld's testimony that S.M. was not ready for a larger class size because he continued to have challenges with articulation, written language expression, reading, math, fine and gross motor skills, time management, and organization. *Id.* at 670:4–14, 675:16 – 676:17, 789:16 – 790:6. But the IEP provided for reading, math, occupational therapy,

---

[15] Although the ALJ did not rely on Ms. Dolginoff's testimony, the Court will consider it. Ms. Dolginoff was "the IEP specialist on [S.M.'s] case," and she observed him monthly in math class. Hr'g Tr. 136:18–24. The plaintiffs also rely on Ms. Kunz's testimony that S.M. needs small class sizes so that he can receive teacher feedback and assistance and communicate with his teachers and classmates. *Id.* at 545:9 – 546:25; *see* ECF 13-1, at 29–30. The Court gives little weight to Ms. Kunz's testimony because she only knew S.M. "as a student [she] see[s] walking around the halls of Lab School as well as on our speech and language floor and also through talking with the clinicians that worked with him over the past few years." Hr'g Tr. 520:17–20. And even if her testimony is credited, it does not change the outcome. S.M.'s speech and language needs can be met at Barnsley under the IEP.

and speech and language services to be provided outside of general education in small settings with no more than seven students and, in some instances, individual instruction. Parents' Ex. 27, at 72–76. And in general education specials, lunch, and recess, S.M. would be accompanied by a paraeducator, and if staff saw that he needed a smaller class size for specials, they would accommodate him. *Id.* at 73; MCPS Ex. 42, at 2; Hr'g Tr. 1216:19–22. These facts were not addressed by Mr. Weinfeld. The Court gives little weight to his opinion that S.M. was not ready for larger class sizes in specials.

The Court finds that the IEP and placement in Barnsley's twice-exceptional program, with inclusion in mainstream specials classes, lunch, and recess, provided S.M. with a FAPE.

### D.  ReST Program and Orton-Gillingham Methodology

The IEP provided that S.M. would receive speech and language services using Rapid Syllable Transition Treatment and reading instruction, and the parties agreed that reading instruction would be provided using the Orton-Gillingham approach. MCPS Ex. 42, at 3–4. Even though the parents approved of these teaching methods, they appear to contend that Barnsley staff could not implement them in a manner that would provide S.M. with a FAPE. They claim the ALJ erred in failing to address how the staff would instruct S.M. using ReST and Orton-Gillingham.

In their due process complaint and at the administrative hearing, the plaintiffs did not object to placement at Barnsley on the ground that the staff could not implement the ReST program. So the ALJ did not address ReST in her decision. The plaintiffs' objection here appears to be that when "Mr. Weinfeld and S.M.'s mother went to Barnsley to see the program [in the fall of 2022], they asked about the delivery of the ReST program and nobody could provide any information." ECF 13-1, at 32. But the plaintiffs admit that, at the due process hearing, MCPS witness Ms. Mohl "offered a wealth of information about how the program would be delivered" to S.M. at Barnsley.

*Id.* Ms. Mohl's undisputed testimony establishes that, in accordance with the IEP, S.M. would receive speech and language services using the ReST program at Barnsley. The IEP was reasonably calculated to enable S.M. to make appropriate progress in speech and language in light of his circumstances.[16]

The plaintiffs also object to placement at Barnsley because S.M. would receive reading instruction using the Orton-Gillingham methodology with younger students, and this arrangement "would be detrimental to his self-esteem and cause a lot of anxiety." ECF 13-1, at 32–33. Their witness, Ms. Dolginoff, testified that she "would have a lot of concern with [S.M.] being partnered with younger children, and it goes . . . to that . . . feeling that he's moving backwards." Hr'g Tr. 152:15–21. Ms. Jackson of MCPS testified that at Barnsley a certified reading specialist trained in Orton-Gillingham would instruct S.M. how to read using the method and would work either one-on-one with S.M. or work with S.M. and one other student one grade below S.M. *Id.* at 1381:24–25, 1382:6–7, 1385:14–21. So at Barnsley, S.M. would not receive reading instruction in a group of younger children. Moreover, according to Ms. Jackson, Barnsley administers the Orton-Gillingham method "the way it was intended." *Id.* at 1671:10–11, 1701:19 – 1705:11. The IEP was reasonably calculated for S.M. to make appropriate reading progress in light of his circumstances.

---

[16] MCPS argues the ReST claim is unexhausted because the parents did not raise it in their due process complaint or before the ALJ. Parents are required to request a due process hearing before they bring an IDEA claim in federal court, save for three limited exceptions. *See M.M*, 303 F.3d at 535–36 (citing 20 U.S.C. § 1415(f)). The parents complied with that requirement. They requested a due process hearing before filing this suit. They did not, however, identify the inability of Barnsley to administer the ReST program as a ground for their due process challenge. The Court has not located (and MCPS has not cited) any binding authority that requires parents to administratively exhaust every issue. The Court need not decide whether there is an issue exhaustion requirement in IDEA cases. Regardless of whether the claim was exhausted, it has no merit.

### E.  Procedural Violation

"[T]he IDEA guarantees certain procedural rights, including the rights of parents to 'examine all records' relating to their child and to 'participate in meetings' regarding the identification, evaluation, and placement of their child." *G.M.*, 114 F.4th at 330 (quoting 20 U.S.C. § 1415(b)). The plaintiffs claim the "timing of the MCPS proposal for S.M. significantly impacted the parents' participation in the IEP process by hindering their ability to properly consider the new proposal before the start of the school year," and the timing violated S.M.'s right to a FAPE because the parents had "to file a due process appeal and proceed through the hearing, all at their own cost." ECF 13-1, at 18 & 19 n.3. They insist they "should not have to invoke their stay put rights in order to receive a *free* and appropriate public education." *Id*. at 19.

"A 'mere technical contravention of the IDEA' that did not 'actually interfere with the provision of a FAPE' is not enough. Rather, the procedural violation must have caused substantive harm." *T.B., Jr. ex rel. T.B., Sr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 573 (4th Cir. 2018) (quoting *DiBuo ex rel. DiBuo v. Bd. of Educ.*, 309 F.3d 184, 190 (4th Cir. 2002)); *see A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 679 n.7 (4th Cir. 2007) (noting that a procedural violation is "subject to harmlessness analysis [unlike] a substantive violation"). When there is no "substantive violation, a . . . court 'may do nothing more than order a school district to comply with the [IDEA's] various procedural requirements.'" *G.M.*, 114 F.4th at 343 (quoting *R.F. ex rel. E.F. v. Cecil Cnty. Pub. Schs.*, 919 F.3d 237, 248 (4th Cir. 2019)) (alteration in original).

Here, the Court has found no substantive violation of the IDEA and has determined that S.M. received a FAPE at Barnsley. Because there is no finding that MCPS failed to provide S.M. a FAPE, the only available relief for the alleged procedural violation would be an order directing MCPS to comply with the IDEA's procedural requirements. But the plaintiffs do not seek any

procedural relief. "In this type of situation, our Court declines to address potential procedural violations." *G.M.*, 114 F.4th at 343 (citing *T.B., Jr.*, 897 F.3d at 573–74).

## V.      Conclusion

The 2022–2023 IEP and the placement at Barnsley provided S.M. with a FAPE. Barnsley's twice exceptional program is one of a few of its kind in public schools across the country. Hr'g Tr. 961:10–13. The program would build on S.M.'s strengths as a gifted learner and address his needs as a learning-disabled student. According to Ms. Jackson, the head of MCPS's GT/LD program, "[m]ost research shows that twice exceptional students need to have . . . a strength based approach which means that you focus on where their strengths are first and you accommodate and modify for their weaknesses second." *Id.* at 1144:9–20. Barnsley offered S.M. that strength-based approach. Even the parents' educational expert, Mr. Weinfeld, who has known S.M. since he was five and whose opinions the Court has carefully considered, agreed with Ms. Jackson that twice-exceptional learners like S.M. need a rigorous educational program. Barnsley offered S.M. the rigorous educational program that he needs.

The IDEA mandates that "'[t]o the maximum extent appropriate,' a child with a disability should be 'educated with children who are not disabled.'" *G.T.*, 2024 WL 4049222, at *1 (quoting 20 U.S.C. § 1412(a)(5)(A)). The 2022–2023 IEP complied with that mandate. Where education with non-disabled children was not appropriate—in S.M.'s academic classes—the IEP called for special education with other twice-exceptional students. Where education with non-disabled children was appropriate—in specials, lunch, and recess—the IEP called for special education alongside those peers. The IEP and placement at Barnsley were reasonably calculated to enable S.M. to make progress appropriate in light of his circumstances.

The plaintiffs' motion for summary judgment is denied. MCPS's motion for summary judgment is granted. A separate order follows.


September 30, 2024
Date

Deborah L. Boardman
United States District Judge